THE HONORABLE TANA LIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILLIAM F. ABRAMS,

               Plaintiff,

     v.

UNUM LIFE INSURANCE COMPANY OF
AMERICA,

               Defendant.

Case No. 2:21-cv-00980-TL

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S RULE 52 MOTION FOR
JUDGMENT ON THE RECORD**

**Noting Date: March 11, 2022**

**Table of Contents**

I.    INTRODUCTION .................................................................................................1

II.    ARGUMENT .....................................................................................................4

    A.  Mr. Abrams Has Proved that He Is Disabled from
    His Regular Occupation ..............................................................................4

        1.  Mr. Abrams's condition is real ..........................................................5

        2.  Mr. Abrams is disabled due to a "sickness"
        that was initially properly diagnosed as ME/CFS
        and later properly attributed to presumed COVID ..................................6

            a.  Mr. Abrams is disabled by a "sickness." ........................................6

            b.  Mr. Abrams was accurately diagnosed
            with ME/CFS. ...................................................................................7

                i.    There is no specific laboratory test for ME/CFS. ...............7

                ii.    Three doctors properly diagnosed ME/CFS .......................7

            c.  Mr. Abrams's functional cognitive impairments
            satisfy the diagnostic criteria for ME/CFS.....................................8

        3.  Medical providers properly associated Mr. Abrams's
        symptoms with COVID ......................................................................13

    B.  Unum Denied Mr. Abrams's Disability Claim in Bad Faith. ...............15

        1.  Unum Mischaracterized and failed to analyze
        Mr. Abrams's "Regular Occupation." ........................................16

        2.  Unum ignored Dr. Kober's opinion, which was
        consistent with the record as a whole ........................................18

        3.  Unum failed to engage qualified experts. ..................................20

        4.  Unum's consultants ignored and discounted
        Mr. Abrams's disabling symptoms.............................................20

        5.  Unum cherry-picked facts to support denial.............................22

        6.  Unum disregarded evidence favorable to Mr. Abrams
        and failed to investigate. ...........................................................23

III.    CONCLUSION...................................................................................................24

**Table of Authorities**

**United States Supreme Court**

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003)......................................18

**United States Court of Appeals**

*Bennett v. Kemper Nat. Servs., Inc.*, 514 F.3d 547 (6th Cir. 2008) ..............................21

*Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461 (9th Cir. 1997)........................23

*Broyles v. A.U.L. Corp. LTD Ins. Plan*, 408 Fed. Appx. 67 (9th Cir. 2011) ................19

*Calvert v. Firstar Fin., Inc.*, 409 F.3d 286 (6th Cir. 2005)..........................................6

*Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004*) ................................................5

*Friedrich v. Intel Corp.,* 181 F.3d 1105 (9th Cir. 1999)...............................................7

*Jordan v. Northrop Grumman Corp. Welfare Ben. Plan*, 370 F.3d 869 (9th Cir. 2004)..............19

*Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406 (7th Cir. 2004) .........................................19

*Rasenack ex. Rel. Tribolet v. AIG Life Ins. Co.,* 585 F.3d 1311 (10th Cir. 2009) ........................23

*Ray v. Unum Life Ins. Co. of Am.*, 224 F. App'x 772 (10th Cir. 2007) ...................17, 18

*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011)............................21

*Jimmy Davis, Jr. v. Commissioner, Ala. Dept. of Corrections*,
No. 18-14671-P (11th Cir.) (*pending*) ..........................................................1

**United States District Court**

*Boersma v. Unum Life Ins. Co. of Am.*, No. 3:19-cv-0649,
2021 U.S. Dist. LEXIS 120966 (M.D. Tenn. June 29, 2021).......................................20

*Bunger v. Unum Life Ins. Co. of Am.,* 299 F. Supp.3d 1145 (W.D. Wash. 2018) ...............4, 6, 21

*Chapin v. Prudential Ins. Co. of Am.*, 2021 U.S. Dist. LEXIS 52984
(W.D. Wash. Mar. 22, 2021) .........................................................................24

*Devries v. Aetna Life Ins. Co.*, No. SA CV 19-01499-DOC-DFM,
2020 U.S. Dist. LEXIS 105555 (C.D. Cal. June 16, 2020) .......................................7, 8

*Dimopoulou v. First Unum Life Ins. Co.*, 162 F. Supp.3d 250 (S.D.N.Y. 2016) ...........................7

*DiPietro v. Prudential Ins. Co. of Am.*, No. 03 C 1018, 2004 U.S. Dist. LEXIS 5004
(N.D. Ill. Mar. 25, 2004)........................................................................................ 12-13

*Gallupe v. Sedgwick Claims Mgmt. Servs.*, 358 F. Supp. 3d 1183 (W.D. Wash. 2019)................21

*Heffernan v. Unum Life Ins. Co. of Am.*, No. C-1-97-545, 2001 U.S. Dist. LEXIS
25032 (S.D. Ohio Mar. 21, 2001) .......................................................................17, 18

*Hines v. Unum Life Ins. Co.*, 2018 U.S. Dist. LEXIS 211995 (N.D. Ohio Dec. 17, 2018)..........22

*Kieserman v. Unum Life Ins. Co. of Am.*, No. C21-0448-JCC, 2021 U.S. Dist. LEXIS
233200 (W.D. Wash. Dec. 6, 2021)......................................................................17, 18

*Lukianczyk v. Unum Life Ins. Co. of Am.*, 505 F. Supp.3d 1033 (E.D. Cal. 2020).......................19

*Oldoerp v. WellsFargo*, 12 F. Supp.3d 1237 (N.D. Cal. Jan. 27, 2014)................................. 21-22

*Onofrieti v. Metro.. Life Ins. Co.*, 320 F. Supp.2d 1250 (M.D. Fla. 2004),...................................19

*Perryman v. Provident Life & Acc. Ins. Co.*, 690 F. Supp.2d 917 (D. Ariz. 2010).....................10

*Raithaus v. Unum Life Ins. Co. of Am.*, 335 F. Supp.2d 1098 (D. Haw. 2004) .......................17, 18

*Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp.3d 1114 (C.D. Cal. 2015) ................................12, 19

*Tam v. First Unum Life Ins. Co.*, 491 F. Supp.3d 698 (C.D. Cal. 2020) ......................................18

**Other Authorities**

29 C.F.R. § 2560.503-l(h)(2)(iv) ...........................................................................................12

29 CFR § 2560.503-1 (h)(3)(iii) ..............................................................................................9

Thomas, P., 2022. *Fifteen Years Later - Did the Unum Group Improve
Its ERISA Claims Handling Practices?*. [online] MC Law Digital Commons.
Available at: <https://dc.law.mc.edu/lawreview/vol39/iss2/1/> ................................16, 18, 22, 23

eLife. 2022. *Decreasing human body temperature in the United States since the Industrial
Revolution*. [online] Available at: <https://elifesciences.org/articles/49555> [Accessed 4 March
2022] ...................................................................................................................................22

## I.  INTRODUCTION

Unum never disputed that Mr. Abrams's medical condition was real until it filed its Rule 52 Motion last month. Unum acknowledged Mr. Abrams's symptoms but asserted that they did "not preclud[e him] from performing the material and substantial duties of [his] occupation as an Attorney" (R. 1211), and that his symptoms, "both separately and together," "[did] not provide any restrictions and limitations that would affect the functionality of the whole person." R. 1214. Unum also claimed that despite his "report[ of] disability primarily based on fatigue and other somatic complaints…the available medical records documented generally unremarkable mental status and physical exam findings, inconsistent with his reported impairing levels of fatigue" and that there is "no medical evidence to support Mr. Abrams was limited from performing physical, cognitive, or mental demands of sedentary level work." R. 3972. Now, for the first time, Unum makes the astonishing claim that Mr. Abrams concocted his symptoms. Dkt. #25, pp. 1, 14, 20-22. This accusation is especially offensive because Mr. Abrams asked Unum and its counsel, both before and during this litigation, if they contended that he was lying about his condition, and no response was provided.

Mr. Abrams "was active, vigorous, and fully engaged in [his] work" with no plan to retire, when he suddenly fell ill in April 2020. R. 1635. He "was beginning a litigation for a major client" in a case that "was garnering attention from the mainstream and professional media and significant billings" for his law firm. *Id*. He was scheduled "to help try a significant patent infringement case" and "pursuing business development opportunities and serving on the Board of Directors of three organizations, the Washington Appellate Project, the Southern Center for Human Rights, and the Youth Law Center." R. 1636. He was "preparing for an argument in the Eleventh Circuit…for [his] client…who is on death row…"[1] (R. 1635) and "teaching a class at Stanford University,

---

[1] *Jimmy Davis, Jr. v. Commissioner, Ala. Dept. of Corrections*, No. 18-14671-P (11th Cir.)

Plaintiff's Response to Defendant's Rule 52 Motion - Page 1
Case No. 2:21-cv-00980-TL

Children, Youth and the Law." R. 1636. He had worked "an average of 11.3 hours" per day in the first three months of 2020. R. 1635. Mr. Abrams was an equity partner with a base salary of $525,000, plus deferred performance payments, not including performance bonuses. He was not on a path to retirement, as Unum claims (Dkt. #25, p. 1). Based upon his work and income, it "looked like 2020 would be one of [his] strongest years." R. 1636. Mr. Abrams also had ambitious personal plans in 2020 to participate in three marathons, work with the Lawyers' Committee Election Protection program in Florida, and see his son, Teddy Abrams, conduct his home orchestra in Louisville and guest conduct in several other cities. R. 1635.

When Mr. Abrams suddenly became sick in April 2020, he contacted his Bay Area internist, Dr. Floyd, and quickly established care with internist Dr. Kober at Swedish First Hill Primary Care in Seattle ("Swedish"). Since then, he has been evaluated and treated by eighteen medical specialists and undergone extensive testing. Dr. Kober confirmed, based upon in-person interview and evaluation, laboratory testing, and the specialist evaluations, that Mr. Abrams is disabled from all work by his symptoms, which are primarily self-reported. *See,* p. 4, *infra*. No provider has suggested that Mr. Abrams has exaggerated his symptoms or can return to work. Six witnesses provided observations that corroborated Mr. Abrams's self-reports based upon interactions with him before and after the onset of his severe illness.

None of these facts are disputed.

Unum's actions in denying Mr. Abrams's disability claim have been rebuked by courts for 20 years. Unum made the preposterous assertion that his occupation as a trial and appellate lawyer with a national and international practice is "sedentary." Unum rejected the conclusions of eighteen specialists from Swedish and the University of Washington Post-Covid Clinic, and video evidence of Mr. Abrams's daily fevers. Unum denied coverage based on the opinions of three unqualified in-house physicians, who failed to address whether he could perform his regular occupation as a trial and appellate lawyer; erroneously asserted the diagnostic criteria for ME/CFS;

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

ignored medical science regarding COVID; and cherry-picked medical findings to support denial while ignoring evidence supporting disability. Unum failed to investigate, consult with relevant infectious disease or virology experts, and examine Mr. Abrams.

Unable to rebut the extensive evidence in the record, Unum now accuses Mr. Abrams of fabricating his illness and disability – aided by his extensive medical team – to obtain benefits. This new accusation is particularly outrageous because Mr. Abrams asked Unum and its lawyers four times, both before and during this litigation, if Unum contended that he was lying about being disabled. Unum never answered the question.

Unum's accusation makes no sense. Mr. Abrams would have earned far more in 2020 alone, had his health permitted, than the benefits at stake in this case.[2] Moreover, Unum's contention is contrary to Mr. Abrams's work throughout his 40-year career as a lawyer. Lying about his condition would be contrary to his values, demonstrated through decades of service, representing disadvantaged youth and asylum-seekers and seeking to overturn wrongful convictions of incarcerated people on death row; serving on boards of directors of non-profit legal and human rights organizations; volunteering in election protection efforts; and teaching and serving as an advisor at Stanford University. R. 1635-36, 3962. It is contrary to his "phenomenal" "worth ethic, drive, and love for his career." R. 1871. Unum's baseless, scurrilous accusation should be rejected by this Court.

When Mr. Abrams got sick and could not work, he reasonably expected that Unum would promptly approve his claim, which was fully supported by his treating provider and medical record. Mr. Abrams was justifiably furious when Unum repeatedly delayed and ultimately denied his deserving claim. *See,* Dkt #25, pp. 5-6. As thoroughly documented in the record, Mr. Abrams

---

[2] Had money been Mr. Abrams's motivation, he could have retired at the end of 2020 and been paid more in one year than Unum is required to pay over three years, without the dilution in value of the benefits due to inflation.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

cannot perform the duties of his "Regular Occupation" as a trial and appellate lawyer due to sickness. Unum should be ordered to pay his disability claim.

## II. ARGUMENT

### A. Mr. Abrams Has Proved that He Is Disabled from His Regular Occupation.

Since April 2020, Mr. Abrams has suffered from frequent fevers, chronic fatigue, brain fog, cognitive impairment (concentration, word-finding, memory, and learning deficits), malaise, body aches, hand and foot pain, chronic migraines/headaches, sleep problems (poor/irregular sleep, difficulty initiating and remaining asleep, unrefreshing sleep, hypersomnolence, and vivid nightmares), night sweats, worsening of a left-hand tremor, abdominal cramping, chest pain and depression. His treating internist and specialists in infectious diseases, rheumatology, neurology, pulmonology, endocrinology, sleep medicine, and COVID initially attributed his symptoms to post-viral syndrome or ME/CFS, then, as medical research developed, to COVID. The name of his medical condition, though, is irrelevant to the fact that Mr. Abrams is indeed disabled under Unum's policy. *See, Bunger v. Unum Life Ins. Co. of Am.*, 299 F. Supp. 3d 1145, 1150 (W.D. Wash. 2018) (holding, in rejecting Unum's denial of a disability claim, "…due to chronic fatigue syndrome (CFS), Lyme disease, or an unspecified illness…" that "*Unum appeared to conflate the issue of whether Mr. Bunger is sick with the issue of whether he has been properly diagnosed. Even if not correctly diagnosed, it did not mean Mr. Bunger was not sick…*" (emphasis added)).

Dr. Kober confirmed that Mr. Abrams is disabled from all work. *See,* Dkt. #30-1, p. 18 (citing R. 45, 46 ("...Patient currently unable to work…"), R. 1248 ("...inability to work in any capacity."), R. 1633 ("Despite all efforts, he appears and reports to feel very unwell. He has little capacity for activity beyond self-care.")). Eighteen specialists evaluated and treated Mr. Abrams and documented his severe symptoms. No provider suggested that he was exaggerating his reports. Six witnesses, including three professional colleagues (one the former Chair of the NLRB, another an expert on infectious diseases and viruses at Stanford University), summarized their observations

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

of Mr. Abrams's struggle with cognitive problems and fatigue, corroborating his self-reports, the medical record, and Dr. Kober's opinion. *See,* Dkt. #30-1, pp. 12-15 and pp. 10-13, *infra*. There is no dispute about these facts. Instead, Unum argues – without evidence – that Mr. Abrams concocted his symptoms and successfully misled all experts and witnesses about his condition.

### 1. Mr. Abrams's condition is real.

It is implausible that Mr. Abrams fooled Dr. Kober and eighteen specialists to prescribe treatment and extensive testing for fake symptoms. It is implausible that he fabricated an illness, but that none of his many providers expressed concern about his credibility. It is implausible that he fooled the Executive Director of the University of Washington Post-Long Haul COVID Clinic into believing he required treatment when he was not sick. *See,* Dkt. #30-1*,* pp. 4-12. In *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004), the Court found it "improbab[le]" that a "host of medical workers would prescribe drugs and other treatment" to the plaintiff "if they thought she were faking her symptoms." The Court concluded, "Such an inference would amount to an accusation that the medical workers who treated Carradine were behaving unprofessionally."

Providers expressed genuine concern about Mr. Abrams's chronic symptoms. On June 11, 2020, Dr. Kober stated that he was still suffering fevers and, expressing consternation, wrote "[w]ill do additional testing to try to figure this out." R. 598. Hematologist Dr. Hegerova stated in September, "He is understandably frustrated at lack of diagnosis." R. 1480. Neuropsychologist Dr. Winnett wrote, based upon interview, that Mr. Abrams was a "good historian" and "pleasant and cooperative." R. 2312, 2315. Her "validity testing corroborated good effort" and she concluded, "the present results are believed to be valid." *Id*. In February 2021, Dr. Kober described Mr. Abrams as "understandabl[y] distraught, alarmed, depressed and anxious" and noted that he "expresses genuine concern about the duration and severity of his illness and his future, with good reason." R. 1633. Consistent with Dr. Winnett's impressions and contrary to Unum's fabrication contention, Dr. Kober assessed, "no evidence of symptom magnification…." *Id*. She also

Plaintiff's Response to Defendant's Rule 52 Motion - Page 5
Case No. 2:21-cv-00980-TL

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

observed, "[d]espite all efforts, he appears and reports to feel very unwell." *Id*. As the primary physician who treated Mr. Abrams ten times over ten months, she was in an ideal position to assess his credibility.

Unum's claim that Mr. Abrams influenced infectious disease specialist Dr. Boggs's statement of June 30, 2020, that Mr. Abrams was "thought to have post-viral syndrome" is also incorrect. Doc. #25, p. 15. Infectious disease specialist Dr. Moss had noted after evaluating Mr. Abrams on June 3, 2020: "This sounds like a mono-like syndrome but is unlikely to be caused by the Epstein-Barr virus. He is CMV negative. *I suspect some other virus but I am not sure which one*." R. 1365. Mr. Abrams obviously was reporting Dr. Moss's conclusion to Dr. Boggs, who recommended Mr. Abrams "continue to make a symptom diary" and undergo further testing. *Id*.

The medical assessments were corroborated by first-hand observations of six witnesses who have known Mr. Abrams for many years. *See,* Dkt. #30-1, pp. 12-15, p. 10-12, *infra*. Unum, whose in-house consultants never met or spoke with Mr. Abrams, has no reasonable basis to attack his credibility. *See, Bunger* 299 F. Supp. 3d at 1163 (finding the opinions of Unum's four file review physician-consultants, who "…were unable to personally observe Mr. Bunger or assess the credibility of his reporting" unpersuasive); *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 297 n 6 (6th Cir. 2005) ("Where…the conclusions from [a file] review include critical credibility determinations…reliance on such a review may be inadequate.").

### 2. Mr. Abrams is disabled due to a "sickness" that was initially properly diagnosed as ME/CFS and later properly attributed to presumed COVID.

#### a. Mr. Abrams is disabled by a "sickness."

Unum's arguments that Mr. Abrams was incorrectly diagnosed with ME/CFS and long COVID are irrelevant and erroneous. *See,* Dkt. #25, pp. 5, 7-10. Unum improperly conflates the issue of whether Mr. Abrams is disabled with whether he was properly diagnosed. *See, Bunger,* 299 F. Supp. 3d at 1150. Regardless of his diagnosis, he is disabled by "sickness" (R. 105), defined

in Unum's policy as "an illness or disease…" R. 126. Dr. Kober explained in her September 2020 letter, "*Although we have not had a unifying diagnosis for his current symptoms, it is the symptoms that are causing his disability and inability to work in any capacity*." R. 1248 (emphasis added). *See also, Dimopoulou v. First Unum Life Ins. Co.*, 162 F. Supp. 3d 250, 260 (S.D.N.Y. 2016) ("it was arbitrary and capricious for Unum to fail to analyze whether plaintiff's actual symptoms, as opposed to her diagnoses, satisfied the plan's definition of a disability.").

### b.  Mr. Abrams was accurately diagnosed with ME/CFS.

### i.     There is no specific laboratory test for ME/CFS.

"…'Researchers have not yet found what causes ME/CFS, and there are no specific laboratory tests to diagnose ME/CFS directly. Therefore, doctors need to consider the diagnosis of ME/CFS based on in-depth evaluation of a person's symptoms and medical history.'" *Devries v. Aetna Life Ins. Co.*, No. SA CV 19-01499-DOC-DFM, 2020 U.S. Dist. LEXIS 105555, at *27 (C.D. Cal. June 16, 2020) (quoting the Centers for Disease Control ("CDC")); *See, Friedrich v. Intel Corp.*, 181 F.3d 1105, 1112 (9th Cir. 1999) ("The standard diagnosis technique for [ME/CFS] includes testing, comparing symptoms to a detailed [CDC] list of symptoms, excluding other possible disorders, and reviewing thoroughly the patient's medical history.").

ME/CFS is associated with a wide array of subjective symptoms, including – in addition to core symptoms of chronic fatigue, post-exertional malaise, sleep problems, and cognitive problems and/or orthostatic intolerance – muscle pains and aches, joint pains, new or increased headaches, tender lymph nodes, sore throat, digestive issues, night sweats, sensitivities to foods, odors, chemicals, light, or noise, muscle weakness, shortness of breath, irregular heartbeat, low grade fever, and depression. R. 1876-77, 2214 (CDC, Cedars Sinai). Mr. Abrams exhibited virtually all these symptoms. *See,* Dkt. #30-1, pp. 6-15.

### ii.    Three doctors properly diagnosed ME/CFS.

Infectious disease specialist Dr. Goldman accurately diagnosed ME/CFS in the fall of

2020, six months after the onset of symptoms, in accordance with the Institute of Medicine's ("IOM") diagnostic criteria (R. 2187-88).[3] He was uniquely qualified by his medical specialty. Dr. Simon documented his own thorough interview and examination of Mr. Abrams and review of prior testing and explained the basis for his concurrence. Dr. Kober, who interacted with and examined Mr. Abrams over the course of numerous appointments, also had a sound basis for her concurrence. *See,* Dkt. #30-1, pp. 8-9 and R. 1398-1404 (Dr. Goldman), R. 1502-03, 1506-09, 1514-22 (Dr. Simon), R.1632, 1520 (Dr. Kober). *See*, *Devries,* 2020 U.S. Dist. LEXIS 105555, at *30 (the treating physicians, who diagnosed ME/CFS after interacting with plaintiff "over the course of numerous appointments…were in a far better position" to make such a determination than were the insurer's consultants "who had only documents available for review." *Id.*, at *30).

UNUM erroneously states that Dr. Winnett "*rejected* the ME/CFS diagnosis." Dkt. #25, p. 10. Dr. Winnett concluded that Mr. Abrams's "significant depression and perhaps a mild anxiety spectrum disorder" were "not the source of [his] isolated visual encoding/visual retrieval difficulties," and, based upon cognitive testing, did not diagnose "Mild Cognitive Impairment" (ICD-10 G31. 84). R. 2319. She acknowledged without further comment that Mr. Abrams *did have* "what is being currently identified as myalgic encephalomyelitis syndrome." R. 2311.

### c. Mr. Abrams's functional cognitive impairments satisfy the diagnostic criteria for ME/CFS.

Unum asserted in denying Mr. Abrams's appeal that Dr. Goldman diagnosed ME/CFS incorrectly (R. 3973), based upon Unum's Dr. Norris's incorrect assertion in his file review that Mr. Abrams "did not meet criteria for CFS/ME, as clinical MSEs and NP testing did not support significant cognitive impairment." R. 3903. *See,* Doc. #25, pp. 6, 10, 11, 12, 16. Dr. Norris's statement reflects both his lack of expertise and his disregard of the evidence:

- Functional *cognitive deficits do not have to be confirmed by formal testing* for ME/CFS to be accurately diagnosed.

---

[3] *See* AR 2188 (ME/CFS diagnostic criteria, including the requirement that substantial reduction in ability to engage in pre-illness levels of activity be present for six months for an ME/CFS diagnosis to be made).

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

- There is copious credible evidence that Mr. Abrams suffers from disabling cognitive impairments. *See,* Dkt. #30-1, pp. 12-15 and pp. 11-13, *infra.*

*On the first point*, the CDC states that the "*symptom*" of cognitive impairment (or of orthostatic intolerance) must be present for a valid diagnosis of ME/CFS to be made and explains how many patients perceive the "*symptom*" of cognitive impairment:

> *Problems with* thinking and memory. Most people with ME/CFS have *trouble thinking quickly, remembering things, and paying attention to details*. Patients *often say they have "brain fog"* to describe this problem because *they feel stuck in a fog and not able to think clearly.*

R. 1876 (emphasis added). Similarly, Cedars Sinai's website states that a common symptom of ME/CFS is "*[d]ifficulty thinking* that gets worse[] under pressure." R. 2215 (emphasis added). Medical literature explains that "...from the clinical perspective, neuropsychological testing has shown significant overlap between ME/CFS and control populations, and that self-report of cognitive issues offers a more reliable means of discriminating between these two groups." R. 2002 (*The National Academies Press*, "Beyond [ME/CFS]: Redefining an Illness" (2015), p. 98). Mr. Abrams's appeal included these articles. *See,* R. 1290.

Dr. Goldman's statement that Mr. Abrams "has cognitive impairment, which is manifest by problems with thinking or executive function exacerbated by exertion, effort, or stress or time pressure" (R. 1398-99) underscores that functional cognitive deficits *do not have to be confirmed by formal testing* for ME/CFS to be accurately diagnosed. Dr. Goldman knew this because he is an infectious diseases expert. Because Unum's denial of Mr. Abrams's claim was "based in whole or in part on a medical judgment," Unum was required, in evaluating his ERISA appeal, to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 CFR § 2560.503-1 (h)(3)(iii), (4). Dr. Norris's erroneous assumption that an ME/CFS diagnosis requires proof of cognitive impairment through cognitive testing shows that he lacked that required expertise.

Plaintiff's Response to Defendant's Rule 52 Motion - Page 9
Case No. 2:21-cv-00980-TL

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

It is not surprising that Mr. Abrams performed well overall on cognitive testing. Dr. Winnett administered her testing over a few hours in an office setting and Mr. Abrams found it "boringly easy compared to the work he would do as an attorney." R. 2516. Yet even under optimal test conditions, he had "isolated difficulty with complex visual-spatial reproduction and retrieval." AR 2319. *See Perryman v. Provident Life & Acc. Ins. Co.* [UNUM], 690 F. Supp. 2d 917, 945 (D. Ariz. 2010) ("…the Court is unpersuaded that the lack of objective mental testing requires it to totally discount the observations of Perryman's treating physicians who noted the existence of various neuropsychological problems during their treatment of her.").

Unum misleads by cherry-picking Dr. Reif's comments that Dr. Winnett's testing showed Mr. Abrams was "cognitively normal" and that some providers "suspected that depression may have something to do with" his symptoms. Dkt. #25, pp. 10-11. Dr. Reif documented many severe symptoms at all three office visits (R. 1538, 1555, 1528) and assessed post viral syndrome with exhaustion, cognitive fog, and insomnia in February 2021. R. 3739. Consistent with all other providers, she never expressed any concern that Mr. Abrams was exaggerating his reports.

*On the second point,* Mr. Abrams described cognitive problems at virtually every office visit, in forms and statements solicited by Unum, and in his three detailed statements to Unum. R. 63-64, 135, 138, 1635-40, 3802-05, 3964-65. His reports were corroborated by six witnesses.

Brenna Legaard, a partner at Schwabe (now at K&L Gates), worked with Mr. Abrams closely before and after the onset of his sickness. She described signs of cognitive impairment she saw when he attempted to resume work, after becoming sick, that precluded the practice of law:

- The "few times he tried" to perform legal work, his "communications were confused."
- "It was unclear to me that he was able to understand the information conveyed to him or participate in the analysis."
- "I tried to call him but he rarely picked up, as he was too fatigued to talk by phone."
- "…I emailed him every day. He always replied, but his replies were usually only a few words long. He frequently promised to call, but he was never able to do so, as he was simply too fatigued. He told me that the brain fog was debilitating, and he could not read or even watch TV."

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

- Communications with a lawyer were so "confused" that Ms. Legaard "expressed concern to Schwabe management that Bill was too impacted by his illness to perform legal work."

R. 1872. Contrary to Unum's assertions (Dkt. #25, p. 23), Ms. Legaard's statement was based upon first-hand interactions with Mr. Abrams before and after the onset of illness. AR 1871-73.

Stanford Professor Robert David Siegel, M.D., Ph.D., who has "known Bill for many decades" through teaching and has "stayed in close contact" with him, provided his observations of cognitive problems after the onset of sickness. R. 3962. He provided a precise description of the "two things" he found "most striking": "1) after some period of time he will state that he is exhausted and has to go and lie down; 2) when I make suggestions, he will often tell me [he] has to write them down or ask[s] me to send them to him so he can remember them." R. 3963.

Professor William B. Gould IV, former Chair of the NLRB, who has known Mr. Abrams "professionally and personally, for nearly two decades," observed since the onset of sickness, "slower speech and an inability to process information that requires analysis," "losing his train of thought in conversation, genuine confusion, apparent reduced concentration," word-finding difficulties and "inability to recollect recent conversations and considerable difficulty with complex information requiring analysis..." R. 3960. Like Ms. Legaard, Dr. Siegel and Mr. Gould observed evidence of specific cognitive problems based upon their interactions with Mr. Abrams.

Three family members corroborated Ms. Legaard's, Dr. Siegel's and Mr. Gould's observations. Mr. Abrams's sister, Peggy Abrams, confirmed that her brother's inability to "sustain a conversation without needing to leave to get rest," slow speech and response times, and difficulties "finding the simplest of wor[d]s and thoughts" are "totally unlike him." R. 3957. His son, Teddy Abrams, observed in June 2021 that his "formerly sharp, brilliant, funny father" had "become mentally slowed," was "frustrated with brain fog and word finding difficulties," "would get profoundly exhausted after just 60-90 minutes of socializing or light activity," "appeared fatigued and drawn," suffered "mental exhaustion" and "would have to search for words and

Plaintiff's Response to Defendant's Rule 52 Motion - Page 11
Case No. 2:21-cv-00980-TL

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

memories (something I've never seen him do), with obvious frustration..." R. 3958-59. Mr. Abrams's wife, Karen O'Leary, observed that Mr. Abrams now struggles "to concentrate enough to read or watch some TV," "can read for only 10-15 minutes at most before losing concentration," cannot "follow the story lines of movies..." (R. 1874) and "loses his train of thought, forgets things, and has less interest in the world." R. 3806. The family members' observations are consistent with the record as a whole, including the observations of the non-family witnesses. There is no reasonable basis for Unum to claim bias (Dkt. #25, pp. 22-23).

All six before-and-after witnesses provided highly relevant evidence that Mr. Abrams suffers slowed thinking, loss of train of thought, word-finding problems, and signs of cognitive fatigue that prevent him from practicing his regular (or any) occupation. They show that, contrary to Unum's assertions (Dkt. #25, p. 17), Mr. Abrams could not work in his regular occupation due to his cognitive impairments and severe fatigue, as Dr. Kober stated. Unum's reliance upon *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp.3d 1114, 1136 (C.D. Cal. 2015), in arguing that the Court should ignore these statements is misplaced. Contrary to the facts of *Shaw*, the six statements are consistent with one another and do not attempt to "compensate for…insufficient medical evidence" but fully corroborate the record as a whole. *Id.*

Mr. Abrams submitted the Siegel, Gould and family member statements in July 2021, in response to Unum's invitation to address Dr. Norris's file review. R. 3952, 3930-31. Unum stated in its final July 2021 denial, "Your response did not include any additional clinical evidence… and additional review by our appeal physician was not warranted." R. 3975. Unum ignored all six witness statements in violation of its duty to provide Mr. Abrams a "full and fair" appeal review under ERISA. 29 C.F.R. § 2560.503-l(h)(2)(iv). In its Motion, Unum admits it did not review this evidence, but does not address its blatant violation of the regulation. *See,* Dkt. #25, p. 13 ("Plaintiff's attorney submitted an attorney letter with descriptive statements from additional colleagues and Plaintiff, but no additional medical information was provided."); *See also, DiPietro*

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

*v. Prudential Ins. Co. of Am.*, No. 03 C 1018, 2004 U.S. Dist. LEXIS 5004, at *17 (N.D. Ill. Mar. 25, 2004) (insurer unreasonably ignored letters of seven family members, friends and co-workers of a post-polio patient who "observed plaintiff's increasing fatigue, [including] statements from his Washington co-workers that his difficulty concentrating began to affect his work and at times his pain forced him to leave work early.").

### 3. Medical providers properly associated Mr. Abrams's symptoms with COVID.

As COVID research advanced and long COVID was discovered and then recognized as a chronic illness that affects millions of patients – including many who became ill early in the pandemic and/or who have never tested positive for COVID – specialists associated Mr. Abrams's symptoms with long COVID. Unum's accusation that Mr. Abrams persuaded his internist, Dr. Kober (R. 602, 590), neurologist Dr. Reif (R. 1555), pulmonologist Dr. Pappas (R. 3760)[4] and Dr. Friedly, Executive Director of the UW Post-COVID Clinic (R. 3798), to diagnose presumed COVID when they did not actually hold that opinion is preposterous. *See,* Doc. #25, pp. 5, 7-8. It is incredible that Unum accuses doctors at UW and Swedish of colluding to submit a false claim.

Mr. Abrams suddenly became severely ill in April 2020, in Seattle, where some of the earliest cases of COVID in the United States were identified. Dr. Floyd, the first provider Mr. Abrams consulted after the sudden onset of illness, suspected that he had COVID despite a negative NAAT test and advised him to "proceed as though it was positive since there is a significant false negative rate." R. 1584. On May 11, PA-C Golodner, a practitioner in Dr. Kober's clinic, advised, "I suspect your symptoms are from COVID-19. The swab tests do not have high accuracy so your test could have been a false negative." R. 1345. Mr. Abrams's subsequent

---

[4] Mr. Abrams did not refuse a T Detect COVID-19 assay that Dr. Pappas "actually recommended." Dkt. #25, p. 21. Dr. Pappas's comment about the test was: "If [this test] can provide evidence of prior COVID-19 infection without being confounded by COVID-19 vaccination, it may be an interesting test to pursue." R. 3760. Implicitly, he viewed the test as something that *might* be worth obtaining in the future, *depending upon the outcome of research*.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

negative NAAT and antibody IgG test results were issued with warnings that the tests were not "FDA cleared or approved" and had been "authorized by FDA under an Emergency Use Authorization (EUA)." R. 1336, 609. Both results also warned that false negative results should be considered in the context of clinical evaluation. R. 1336, 609.

Ever-growing COVID research confirms that many presumed long COVID patients – particularly those who became sick early in the pandemic – have had repeated negative COVID tests. "Long-Haulers are Fighting for their Future," which appeared in *The Atlantic* on September 1, 2021, explains that "many long-haulers have negative results from PCR tests (which indicate current infection) or antibody tests (which indicate past infection)" and that researchers "suggest that unusual patterns of negative tests or varied symptoms are clues to be explained, not absurdities to be explained away." *See,* Supp. Decl. of Megan Glor, Ex. A, pp. 7-8; *See also, Id.*, Ex. B, pp. 4-5 ("Many of those with long-covid symptoms have tested positive neither for sars-cov-2 nor for antibodies against it – perhaps because…those tests were not sensitive enough to pick up the relevant antibodies before they disappeared – a problem with several of the first generation of antibody tests." ("Researchers are Closing in on Long COVID," *The Economist*, 4/29/21)).

Recent research also shows that, like ME/CFS patients, COVID patients typically suffer diverse and variable symptoms. In August 2020, Schwabe provided Unum an article (R. 985-97) that quotes Dr. David Putrino, a Mount Sinai neuroscientist and rehabilitation specialist, who has treated many COVID "long-haulers": "It's like every day, you reach your hand into a bucket of symptoms, throw some on the table, and say, '[This is] you for today." Glor Supp. Decl. Ex. C, p. 2 ("Long-Haulers Are Redefining COVID-19*," The Atlantic*, 8/19/20).[5] Unum failed to investigate COVID research, even though Mr. Abrams repeatedly told Unum that his providers believed he had COVID. Contrary to Unum's arguments, his symptoms are consistent with COVID and three

[5] The copy of this article in the record contains illegible text. R. 985-997.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

treating experts accurately associated his symptoms with presumed COVID.

**B. Unum Denied Mr. Abrams's Disability Claim in Bad Faith.**

Unum misleadingly asserts that it had four "medical experts" review Mr. Abrams's records. Doc. #25, p. 6. Unum denied Mr. Abrams's claim based upon the assertions of three in-house file review consultants, internists Drs. Mirabelle Kim and Matthew Lundquist, and family, occupational and aerospace medicine physician Dr. Scott Norris. *See* Dkt. #30-1, pp. 15-16. None of the three were specialists in infectious diseases, COVID, or any other relevant specialty. Nonetheless, each acknowledged that Mr. Abrams suffers from a host of symptoms:

- "hypertension, hyperlipidemia, chronic migraine headaches, abdominal pain, sleep disorder, nonessential tremor, depression and anxiety"; "fever, fatigue, malaise, cognitive difficulty." R. 1157 (Dr. Kim).

- "'brain fog' and difficulty with concentration." R. 1185 (Dr. Lundquist).

- "fatigue, cognitive dysfunction, and several other somatic sxs." R. 3905 (Dr. Norris).

It is astounding that Dr. Kim opines that Mr. Abrams's symptoms of "fever, fatigue, malaise, cognitive difficulty, hypertension, hyperlipidemia, chronic migraine headaches, abdominal pain, sleep disorder, non-essential tremor, depression and anxiety," when "analyzed, both individually and collectively as a whole," caused "no additional restrictions and limitations" that "affect the functionality of the whole person." R. 1157 (9/9/20). Likewise, it is astonishing that Unum contends that a trial and appellate lawyer with a busy practice could perform that occupation with these symptoms. In concurring with Dr. Kim, Dr. Lundquist cited negative "physical exam findings" and unrevealing and normal "lab studies" and "mental status exams." R. 1185 (9/10/20). As shown on pages 5-6, 10-13 *supra*, those findings are irrelevant to the issue of whether Mr. Abrams is disabled by fatigue, cognitive impairment, and other subjective symptoms.

Dr. Norris asserted that "physical examination findings and mental status examination findings" were "not [consistent with] the severe level of impairment" Mr. Abrams reported and would not preclude "sedentary level activity (defined in the Referral)..." R. 3905 (6/17/21). He

Plaintiff's Response to Defendant's Rule 52 Motion - Page 15
Case No. 2:21-cv-00980-TL

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

also cited a lack of "structural disease or other pathologic conditions" and claimed that the "level of treatment" Mr. Abrams was receiving "was not [consistent with] the severe level of physical and cognitive impairment" he reported and "would [not] have precluded a sedentary level of occupational activity (defined in the Referral)..." *Id*. His assertions ignore that serious subjective symptoms of Mr. Abrams's illness (which has no known cure) prevent him from performing the material duties of his regular occupation.

Courts have repeatedly admonished Unum for engaging in the bad faith tactics it used in denying Mr. Abrams's claim, namely, rejecting the opinions of treating providers that are consistent with the record as a whole – in favor of contrary assertions of file review consultants; citing negative test findings when the illness is one for which there are no objective tests; asserting that the claimant can perform his or her "sedentary" occupation while ignoring the occupation's cognitive demands; relying upon unqualified experts; ignoring material evidence that supports disability; and calling evidence Unum has ignored irrelevant or biased. *See* Thomas, P. (2021), "Fifteen Years Later - Did the Unum Group Improve Its ERISA Claims Handling Practices?" *Mississippi Coll. Law Review*: Vol. 39, Issue 2 (https://dc.law.mc.edu/lawreview/vol39/iss2/1/)(last accessed 2/20/22) ("*Fifteen Years*").

### 1. Unum mischaracterized and failed to analyze Mr. Abrams's "Regular Occupation."

Unum sold Schwabe "Regular Occupation" disability coverage for its "shareholders" (R. 125, 105), promising to pay Mr. Abrams a $15,000 monthly benefit for 36 months if "due to [] sickness" "you are limited[6] from performing the material and substantial duties of your regular occupation." R. 105. Unum defined "Regular Occupation" as "your specialty in the practice of law which you are routinely performing when your disability begins," adding, "Unum will look at your occupation as it is normally performed, in the national economy…" R. 125.

___

[6] Limited means "what you cannot or are unable to do." R. 124 (policy).

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

In *Ray v. Unum Life Ins. Co. of Am.*, 224 F. App'x 772, 782 (10th Cir. 2007), Unum acknowledged that identical "regular occupation" and "specialty in the practice of law" coverage meant the plaintiff was disabled if she could not perform the material duties of "real estate attorney." The court found the provision even more beneficial, concluding, "Ray's specialty at the time she became disabled was complex and sophisticated real estate transactions." *Id.* at 774, 775. *See also, Heffernan v. Unum Life Ins. Co. of Am.*, No. C-1-97-545, 2001 U.S. Dist. LEXIS 25032, at *12-13 (S.D. Ohio Mar. 21, 2001) (under materially identical coverage, "[t]he parties agree that UNUM's task was to determine whether [the plaintiff] could perform each of the material duties of a litigation attorney."); *Kieserman v. Unum Life Ins. Co. of Am.*, No. C21-0448-JCC, 2021 U.S. Dist. LEXIS 233200 (W.D. Wash. Dec. 6, 2021) ("Regular Occupation" coverage for the "...specialty in the practice of medicine which you are routinely performing…" insured plaintiff for disability from her specialty as an emergency physician); *Raithaus v. Unum Life Ins. Co. of Am.*, 335 F. Supp. 2d 1098, 1124 (D. Haw. 2004) ("...the fact 'regular occupation' is modified by the qualifying term "your" indicates that the focus should be on the Plaintiff's particular medical practice rather than a broader, categorical "physician standard.").

Mr. Abrams's "regular occupation" and "specialty within the practice of law" was trial and appellate attorney. *See*, Dkt. #30-1, p. 22; *see also*, R. 1735-40 (Mr. Abrams's 2002-20 case list). Unum also learned from interviewing him that his practice involved regularly working 15 hour days,[7] preparing briefs, preparing for hearings and going to court 1-3 times per month with "cases [] all over the country," and "lots of marketing and support to get clients in." R. 138.

Unum's Drs. Kim and Norris' reports listed the cognitive demands for the occupation of "attorney," (code "eDOT 110.117-022," R. 1104) and called that occupation "sedentary." R. 1156-

---

[7] *See also* R. 1871 (Ms. Legaard: "Bill worked long hours day after day"; "Bill loved working, and he loved working hard."), R. 1635 (describing "litigation for a major client" that "was garnering attention from the mainstream and professional media" and "preparing for an argument in the Eleventh Circuit Court of Appeals in Atlanta" for a pro bono client "who is on death row in Alabama.").

57, 3905.[8] Dr. Lundquist concurred with Dr. Kim. R. 1184. Unum's consultants, however, did not explain how Mr. Abrams could perform the complex cognitive demands of his practice as a trial and appellate lawyer with his well-documented and corroborated symptoms of crushing fatigue, concentration and word finding problems, frequent fevers, pain, disturbed sleep, and his need for frequent naps. Unum quotes the policy's "regular occupation" and "specialty" coverage provisions (Doc. #25, p. 2), but does not discuss *Ray, Heffernan, Kieserman,* or *Raithaus*, or the material duties of Mr. Abrams's regular occupation (*see, id.*, pp. 2, 3, 13, 18) and falsely asserts that his regular occupation is "attorney." Doc. #25, pp. 15, 18. *See, Fifteen Years,* pp. 212-15, n 81 (eleven federal court decisions issued from 2012 to 2018 finding that Unum had mischaracterized and/or failed to analyze the claimant's occupational duties).

### 2. Unum ignored Dr. Kober's opinion, which was consistent with the record as a whole.

An ERISA fiduciary "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). *See, Tam v. First Unum Life Ins. Co.,* 491 F. Supp. 3d 698, 710 (C.D. Cal. 2020) ("the paper-reviews conducted by Unum's physicians mischaracterized and/or ignored evidence in the record."). Dr. Kober's opinion that Mr. Abrams is disabled and credible is consistent with the medical record as a whole, Mr. Abrams's reports in forms, letters, logs, and temperature videos/photos, the attestations of six witnesses, and medical literature. *See, Fifteen Years,* pp. 218-221 and n 159 (nineteen federal court decisions issued from 2006 to 2019 finding that Unum had unreasonably disregarded the treating physician's opinion).

There is no reasonable basis for Unum's assertion that Dr. Kober's opinion that Mr. Abrams is disabled "was not substantiated by medical evidence." Doc. #25, p. 7. Unum's consultants cited normal test results and benign examination findings, even though such findings

---

[8] *See also,* R. 1211 (Unum's July 2021 denial letter, asserting that "Mr. Abrams's regular occupation" is "attorney.")

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

are expected in ME/CFS and COVID patients. Unum's assertion that Dr. Kober's September 17, 2020 letter "failed to provide any further evidence" to support Mr. Abrams' claim ignores that the record already contained conclusive evidence of his disability. *See,* Dkt. #30-1, pp. 4-15.

Unum cites inapposite cases to support arguments that the Court should reject Dr. Kober's opinion. Dkt. #25, pp. 14-15. *Jordan v. Northrop Grumman Corp. Welfare Ben. Plan*, 370 F.3d 869 (2004), *Broyles v. A.U.L. Corp. LTD Ins. Plan*, 408 Fed.Appx. 67 (9th Cir. 2011), *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 408 (7th Cir. 2004), and *Onofrieti v. Metro.. Life Ins. Co.*, 320 F. Supp.2d 1250, 1253 (M.D. Fla. 2004), were decided under *abuse of discretion* review, where a "wrong, but reasonable" denial is "entitled to deference." Further, *Jordan* concluded that the treating doctor's failure to respond to the administrator's inquiries "…undermined evidence in the petitioner's favor." 370 F.3d at 878. In *Broyles*, the treating doctor's statement was "open to conflicting interpretations." 408 Fed.Appx., at *69. In *Leipzig,* an IME found the claimant not disabled. 362 F.3d at 409. *Onofrieti* pointed to surveillance that showed "capacities" "drastically different" from those the plaintiff reported. 320 F. Supp.2d 1554. On *de novo* review, *Lukianczyk v. Unum Life Ins. Co. of Am.*, 505 F. Supp.3d 1033 (E.D. Cal. 2020), cited road trips, refusal of medical treatment, and inconsistency in the plaintiff's statements in upholding denial. *Shaw* involved a claim based on mental illness. In contrast to the present record – with 18 specialist reports, six witness statements, and 690 elevated temperature readings – there was "minimal documentation of the frequency or intensity of Shaw's symptoms" and she had refused treatment. Also, while the insurer relied on in-house reviewers, they were qualified experts - psychiatrists. 144 F. Supp.3d at 1133. Here, Mr. Abrams has been virtually homebound since April 2020. His reports were consistent and corroborated by witnesses, temperature readings, and medical literature; the record shows he is highly credible; and Unum's consultants were unqualified, ignored material evidence and never examined him or spoke with his doctors.

/ /

Plaintiff's Response to Defendant's Rule 52 Motion - Page 19
Case No. 2:21-cv-00980-TL

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

### 3.  Unum failed to engage qualified experts.

Unum did not engage seven "qualified healthcare experts" and four "medical experts." Doc. #25, pp. 2, 6. Unum relied upon *three unqualified* in-house doctors and their cursory reviews did not address the material duties of Mr. Abrams's regular occupation or consider the record as a whole. None of Unum's consultants had appropriate expertise or examined Mr. Abrams.

Unum argues that Dr. Norris correctly asserted that Mr. Abrams "did not meet criteria for CFS/ME" based upon the absence of "significant cognitive impairment" in "clinical MSEs and NP testing." Doc. #25, p. 12. That assertion is contrary to the diagnostic criteria for ME/CFS and medical literature. *See,* pp. 7-10, *supra.* Unum was recently rebuked by another court for relying on similar uninformed assertions by Dr. Norris. In overturning Unum's denial, the Court stated:

> Dr. Norris, in particular, seems to have simply assumed that fibromyalgia can never be disabling for the purposes of a sedentary job. Neither Dr. Norris nor the defendants, however, has provided any support for such a conclusion—and, indeed, the defendants do not even try, instead attempting to pick isolated bits of Dr. Norris's analysis out to make it seem more nuanced than it actually was…Dr. Norris's conclusory rejection of the possibility that fibromyalgia might be disabling is particularly striking, given that he is not a rheumatologist and does not have meaningful expertise in the condition.

*Boersma v. Unum Life Ins. Co. of Am.*, No. 3:19-cv-0649, 2021 U.S. Dist. LEXIS 120966, at *23-24 (M.D. Tenn. June 29, 2021) (citing 29 C.F.R. § 2560.503-1(h)(3)(v) (under ERISA's full and fair review regulation, the insurer "shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment")).

### 4.  Unum's consultants ignored and discounted Mr. Abrams's disabling symptoms.

The only physicians who asserted that Mr. Abrams was not disabled were Unum's three in-house file reviewers. They cited normal findings and test results as justification for their assertions. They did not analyze the record and their erroneous assertions regarding the diagnostic criteria for ME/CFS and COVID testing reveal their lack of expertise. *See,* pp. 7-13, *supra.*

Unum repeatedly refers to Mr. Abrams's symptoms as "self-reported," implying that an

Plaintiff's Response to Defendant's Rule 52 Motion - Page 20
Case No. 2:21-cv-00980-TL

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

illness cannot be disabling if there is no "dipstick" test for it nor a known cure. Doc. #25, pp. 1, 3-4, 6, 8-9, 13, 14-16, 18, 20-22. There is no medical dispute that ME/CFS and long COVID are commonly disabling. *See,* R. 1936 ("A review of 15 studies conducted between 1966 and 2004 showed that unemployment rates among those with [ME/CFS] ranged from 35 to 69 percent in 13 of these studies (Taylor and Kielhofner, 2005)."), Glor Supp. Dec. Ex. C, p. 4 (studies "suggest that in the United States alone…there are probably hundreds of thousands of long-haulers."). Unum issued Schwabe a disability policy that provides enhanced specialty coverage, including for a disability that results from self-reported symptoms – the hallmark of ME/CFS and COVID. In *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011)*,* the Ninth Circuit stated:

> The plan has no exception to coverage for chronic fatigue syndrome, so CIGNA has taken on the risk of false claims for this difficult to diagnose condition. Many medical conditions depend for their diagnosis on patient reports of pain or other symptoms, and some cannot be objectively established until autopsy. In neither case can a disability insurer condition coverage on proof by objective indicators such as blood tests where the condition is recognized yet no such proof is possible.

642 F.3d at 678.

In *Bunger*, *supra*, Judge Jones found that "Unum did not take the opportunity to request that Mr. Bunger attend an independent medical examination (IME)"… and concluded that the plaintiff met his burden of proving disability from ME/CFS. 299 F. Supp. 3d at 1163-64 (citations omitted). *See also, Salomaa*, 642 F.3d at 666 ("[a]n insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits."); *Gallupe v. Sedgwick Claims Mgmt. Servs.*, 358 F. Supp. 3d 1183, 1193 (W.D. Wash. 2019) ("'...a plan's decision to conduct a file-only review – especially where the right to conduct a physical examination is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.'" (quoting *Bennett v. Kemper Nat. Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008)); *Oldoerp v.*

Plaintiff's Response to Defendant's Rule 52 Motion - Page 21
Case No. 2:21-cv-00980-TL

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

*WellsFargo*, 12 F. Supp. 3d 1237, 1254 (N.D. Cal. Jan. 27, 2014) (where the fiduciary did not analyze whether an ME/CFS patient could perform her occupational duties and declined to exercise its right to obtain an IME, "the record lacks persuasive objective evidence to rebut the credible evidence that Oldoerp was disabled…"). Unum has no reasonable basis to assert that Mr. Abrams did not credibly report his symptoms when his doctor concluded that he credibly reported them and her opinion is fully supported by the record as a whole, and Unum declined to have Mr. Abrams examined, which its policy expressly allows. R. 96.

### 5.  Unum cherry-picked facts to support denial.

Unum cherry-picked facts supporting denial in disregard of the record as a whole:

- Unum's file review consultants cherry-picked normal laboratory findings and examination results (e.g. "occult endocarditis, occult lymphoma or carcinoma, occult chronic meningitis, and Coccidioidomycosis"; "zoonotic or tickborne disease"; "focal neurologic deficits or cognitive difficulty" R. 1214), but omitted that such findings are expected in patients with chronic fatigue and ME/CFS. *See,* Dkt. #30-1, pp. 19-20.

- Unum's consultants cherry-picked negative cognitive test results but ignored Mr. Abrams's reports of cognitive symptoms and the corroborating observations of six witnesses. *See,* pp. 10-12, *supra*, Dkt. #30-1, pp. 12-15, 21-22.

- Unum's consultants cherry-picked 14 temperatures, ignoring that Mr. Abrams's temperature was over 98.6 F 690 of 726 times it was documented.[9] *See,* p. 24, *infra*.

- Unum's consultants cherry-picked negative COVID test results but omitted that such results are common in patients diagnosed with presumed COVID and that the FDA issues a warning about false negative results with the results themselves. *See,* pp. 13-14, *supra*.

*See, Hines v. Unum Life Ins. Co.*, 2018 U.S. Dist. LEXIS 211995, at *15 (N.D. Ohio Dec. 17, 2018) (Unum's reviewers "…largely dance around the questions without providing a principled, reasonable answer and explanation. And yet Unum was still able to cherry-pick language and carry on with its preferred course of action."). *Fifteen Years,* p. 209, n 60 (thirteen federal court decisions issued from 2002 to 2018 finding that Unum had improperly cherry-picked facts).

---

[9] Research shows that "normal" body temperature is now lower than 98.6 F in adults. M. Protsiv, *eLife 2020*, "Decreasing human body temperature in the United States since the Industrial revolution" https://elifesciences.org/articles/49555 (accessed 3/2/22).

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

### 6. Unum disregarded evidence favorable to Mr. Abrams and failed to investigate.

A full and fair review under ERISA must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim." 29 C.F.R. § 2560. 503- l(h)(2)(iv). *See*, p. 12, *supra.; Rasenack ex. Rel. Tribolet v. AIG Life Ins. Co*., 585 F.3d 1311, 1326 (10th Cir. 2009) (a file review that does not engage with the information supporting disability is insufficient). Unum ignored observations by six witnesses who corroborated Mr. Abrams's reports and that were consistent with his medical record. Unum also ignored Mr. Abrams's 726 logged, video recorded and photographed temperature readings – that refuted the implication in Unum's denial letter that, based upon a handful of readings of 98.6 F or less at medical appointments, Mr. Abrams did not suffer recurrent fevers. R. 1213-14. *See*, p. 24, *infra*.

Unum now makes fallacious arguments that the statements are not reliable and disparages hundreds of objective temperature readings. Dkt. #25, pp. 22-23.[10] As a fiduciary, Unum had a duty to investigate if it doubted the accuracy of this evidence. The Ninth Circuit stated in *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461 (9th Cir. 1997):

> "What we got here," said Strother Martin, "is a failure to communicate." This is an all-too-common occurrence when ERISA-covered health benefit plans deny claims. While a health plan administrator may - indeed must - deny benefits that are not covered by the plan, it must couch its rulings in terms that are responsive and intelligible to the ordinary reader. *See* 29 C.F.R. § 2560.503-1(f).[11] If the plan is unable to make a rational decision on the basis of the materials submitted by the claimant, it must explain what else it needs. *Id*.

*Id*. at 1465 (*quoting Cool Hand Luke* (Warner Bros. 1967)). *See Fifteen Years*, p. 209, n 60 (thirteen federal court decisions issued from 2002 to 2018 finding that Unum ignored material evidence supporting disability).

---

[10] Notably, Unum does not assert that the images have been altered and never asked to examine the thermometer.
[11] This regulation also applies to ERISA-governed disability claims.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

The temperature data reveals:

- Mr. Abrams's temperature was over 98.6 F 690 of the 726 times it was documented, including 466/480 readings after noon and 384/393 readings after 2 p.m. *See,* R. 1615, 910, 1399, 3775 (Mr. Abrams's reports that his fevers usually occur in the afternoon).[12]

- 136 of the 138 photographed or video-recorded readings were greater than 98.6 F.

- Mr. Abrams's temperature trended higher later in the day, as he reported, as shown on the graph of all recorded temperatures.

Glor Supp. Decl. Ex. D.

In *Chapin v. Prudential Ins. Co. of Am.*, 2021 U.S. Dist. LEXIS 52984 (W.D. Wash. Mar. 22, 2021), this Court concluded that the insurer "…failed to engage in meaningful dialogue with Plaintiff or meet its fiduciary duty to conduct an adequate investigation…" when it ignored the medical record, in violation of the principle that a "plan administrator may not 'shut [its] eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement.'" *Id.*, at *27 (quoting *Rodgers v. Metro. Life Ins. Co.*, 655 F. Supp.2d 1081, 1087 (N.D. Cal. 2009). This Court should reject Unum's unfounded claims that material evidence it ignored is not credible. Dkt. #25, pp. 4, 8, 22-23.

### III.  CONCLUSION

For the foregoing reasons, plaintiff asks this Court to deny Defendant's Motion.

//

//

//

//

//

//

//

---

[12] *See,* notes 9, 10.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

Dated: March 4, 2022

SIRIANNI YOUTZ SPOONEMORE
HAMBURGER

By:   *s/ Eleanor Hamburger*
By:   *s/ Richard E. Spoonemore*
Eleanor Hamburger (WSBA #26478)
Richard E. Spoonemore (WSBA #21833)
  3101 Western Avenue Suite 350
  Seattle, WA 98121
  Telephone: (206) 223-0303
  Facsimile: (206) 223-0246
  ehamburger@sylaw.com
  rspoonemore@sylaw.com

MEGAN E. GLOR ATTORNEYS AT LAW

By:   *s/ Megan E. Glor*
Megan E. Glor (OSB #930178) *(pro hac vice)*
  707 NE Knott Street, Suite 101
  Portland, OR 97212
  Telephone: (503) 223-7400
  Facsimile: (503) 751-2071
  megan@meganglor.com

Attorneys for Plaintiff William F. Abrams

Plaintiff's Response to Defendant's Rule 52 Motion - Page 25
Case No. 2:21-cv-00980-TL

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2022, I caused the foregoing to be electronically filed with the CLerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

- **Megan E. Glor**
  megan@meganglor.com, robert@meganglor.com

- **Eleanor Hamburger**
  ehamburger@sylaw.com, matt@sylaw.com, stacy@sylaw.com, theresa@sylaw.com

- **Riley R. Moyer**
  moyerr@lanepowell.com, docketing-sea@lanepowell.com, endresj@lanepowell.com

- **D. Michael Reilly**
  reillym@lanepowell.com, docketing-sea@lanepowell.com, fosters@lanepowell.com

- **Richard E. Spoonemore**
  rspoonemore@sylaw.com, matt@sylaw.com, rspoonemore@hotmail.com, stacy@sylaw.com, theresa@sylaw.com

DATED: March 4, 2022

s/ Megan E. Glor
Megan E. Glor (OSB #930178) (*pro hac vice*)