UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILLIAM F. ABRAMS,

           Plaintiff,

  v.

UNUM LIFE INSURANCE COMPANY OF AMERICA,

           Defendant.

C21-0980 TSZ

ORDER

THIS MATTER comes before the Court on plaintiff William Abrams's ("Plaintiff" or "Abrams") motion for judgment under Federal Rule of Civil Procedure 52, docket no. 26. Defendant Unum Life Insurance Company of America ("Defendant" or "Unum") opposes Plaintiff's motion and asks the Court to enter judgment in its favor, docket no. 25. Having reviewed the Administrative Record ("AR"), docket no. 19, and all papers filed in support of, and in opposition to, the motions, the Court determines that oral argument is unnecessary and enters the following Order.[1] This Order comprises the findings of fact and conclusions of law required by Rule 52(a).[2]

---

[1] Plaintiff submits two supplemental declarations and accompanying exhibits. Docket nos. 33, 37. Unum has moved to strike both. Docket nos. 35, 40. After review, the Court is persuaded that Defendant's arguments go toward weight and not admissibility. Defendant's motions to strike are therefore DENIED.

[2] Plaintiff's unopposed Motion to Seal, docket no. 28, is DENIED as moot. Neither party filed their briefs under seal, and their materials have been available for public view since February or March of this year.

ORDER - 1

**Background**

In September 2019, after a long career as a partner at several large law firms, Plaintiff Abrams joined the Schwabe law firm (the "Firm") as a trial and appellate lawyer. AR 151. Professionally, Plaintiff was "beginning a litigation for a major client" and preparing for an argument in the Eleventh Circuit. AR 1635. He had worked "700 hours in three months, for an average of 11.3 hours working/day." *Id*. For his work, Plaintiff received a base salary of $525,000 annually, not including performance bonuses. AR 522. In his personal life, Plaintiff planned to participate in three major international marathons during 2020. AR 135 & 1635. Plaintiff "was active, vigorous, and fully engaged in [his] work" with no plan to retire prior to April 2020. AR 1635.

In April 2020, Plaintiff's plans changed. Plaintiff began to experience frequent, almost daily, fevers. Docket no. 20 (compact discs containing 28 video recordings of Plaintiff taking his temperature at home); AR 1808–52 (Plaintiff's daily temperature logs). He also experienced, among other things, "severe fatigue" and "mental fogginess." *See, e.g.,* AR 1149 & 1590. As a result of these symptoms, Plaintiff had problems "with thinking or executive function exacerbated by exertion, effort, or stress or time pressure." AR 1398–99.

These symptoms also resulted in a sharp decline in Plaintiff's legal abilities. Plaintiff's former colleague at the Firm, a litigation and intellectual property lawyer,

---

The documents have since been uploaded by and are available through privately-operated websites unrelated to and outside the control of the Court. *See* www.bloomberglaw.com/product/blaw; www.pacermonitor.com; www.law360.com.

ORDER - 2

stated that, in February 2020, weeks before the symptoms arose, Plaintiff had helped her on a "very complex patent case." AR 1872. The case required Plaintiff to "learn a technology that was new to him (radio frequency identification), understand the client's very complex global supply chain and business model, and apply complex patent damages law." *Id*. Plaintiff's colleague observed, "He had the analytical ability, legal acumen, and mental energy to attack that learning curve and get up to speed very rapidly." *Id.*

In late April 2020, after Plaintiff's symptoms arose, this same colleague explained that Plaintiff "tried to participate in legal work just as he had before" his illness. *Id.* He "attempted to participate in video and conference calls with clients and team members, strategize . . . , draft work product, review bills, and advise clients," but "could not continue to perform as a lawyer . . ." *Id.* Plaintiff's colleague said that, after the symptoms emerged, the "few times he tried" to perform legal work, Plaintiff's "communications were confused" and "it was unclear to me that he was able to understand the information conveyed to him or participate in the analysis." *Id.* Plaintiff also did not participate in the marathons for which he registered.

Plaintiff tried to address the problem while working at the Firm. Plaintiff visited doctors in April, May, and June of 2020 and reported his symptoms. AR 1342–43. The doctors Plaintiff visited were unable to alleviate his symptoms, however. AR 46, 594, 602, 1615, 1617. On July 10, 2020, Plaintiff filed for Long-Term Disability ("LTD"). The doctors supported Plaintiff's filing. AR 45–46, 49.

ORDER - 3

As a partner at the Firm, Plaintiff was covered under Unum LTD Benefit Policy Number 631962-002 (the "Policy"). AR 89–132. The Policy covered Plaintiff if he could not perform his "regular occupation" because of "disability." AR 105. The Policy defines disability as follows:

> You are disabled when Unum determines that:
>
> - you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
>
> - you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury; and
>
> - during the elimination period, you are unable to perform any of the material and substantial duties of your regular occupation.
>
> You must be under the regular care of a physician in order to be considered disabled.
>
> The loss of a professional or occupational license or certification does not, in itself, constitute disability.

AR 105 (emphasis in original). The Policy defines "Regular Occupation" to mean

> the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location. . . .
>
> For attorneys, "regular occupation" means your specialty in the practice of law which you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

AR 125. The Policy provides a maximum of 36 months of payments for shareholder employees, such as Plaintiff. AR 92–93, 105.

ORDER - 4

On September 14, 2020, based on reviews of Plaintiff's medical history by a therapist, a nurse, and two medical doctors, Unum denied Plaintiff coverage. AR 1155–85. In its denial letter, Unum stated that "Our review concluded that impairment is not supported for the duration of the policy's elimination period (90 days) or beyond." AR 1213. Unum asserted, "The clinical office notes indicate that you have been free of fevers/afebrile and your clinical exams did not indicate any focal neurologic deficits or cognitive difficulty" and that Plaintiff's "treatment plan" of "medications, hematology evaluation, and pulmonary function tests" "can typically be provided concurrently while performing the noted sedentary demand level of [his] occupation." AR 1214.

After Unum denied his claim, Plaintiff decided to appeal. To support his appeal, Plaintiff saw seven different medical doctors. Working with the same symptoms of brain fog, fatigue, decreased attention and concentration, and fevers, three of the medical doctors diagnosed Plaintiff with "long COVID," *see* AR 1555, 3760, & 3788–3801, and four of the medical doctors diagnosed him with Chronic Fatigue Syndrome ("CFS"), *see* AR 592, 1398, 1520, 1551, 3484, 3786, & 3790. Thus, although Plaintiff's physicians did not coalesce around a unifying diagnosis, his physicians did agree on one thing—Plaintiff was sick.

Plaintiff also saw a neuropsychologist who administered a battery of neuropsychological testing, where she tested for cognitive function, ability, and malingering. AR 2310–2320. The neuropsychologist did not find evidence of a cognitive

ORDER - 5

impairment[3] and found Plaintiff to have above-average cognitive ability. AR 2313–15. The neuropsychologist also determined that Plaintiff was not malingering. AR 2313–16.

Armed with this new information, Plaintiff appealed Unum's original denial. In March 2021, Plaintiff submitted a 900-page appeal to Unum, including doctors' reports, witness statements, his own statement, logs/photos/videos of elevated temperature readings in the fall and winter of 2020-21, and medical literature addressing the diagnostic criteria and symptoms of CFS. AR 1289–2218. Plaintiff also submitted three supplemental letters during Unum's appeal review, with additional medical records, temperature recordings, and literature, and four additional witness statements. AR 3735–3806 (5/7/20), 3828–31 (5/28/20), & 3950–65 (7/7/20).

In July 2021, Unum denied Plaintiff's appeal. In its denial, Unum stated that "Mr. Abrams has reported disability primarily based on fatigue and other somatic complaints, including weakness, brain fog, and a persistent fever," but that "mental status and physical exam findings" were "generally unremarkable." AR 3972. Unum stated that neuropsychological tests "demonstrated essentially normal cognitive functioning with the exception of some isolated findings with visual-spatial skills," which was "consistent with his documented mental status exams which did not document cognitive deficits." *Id.* Unum added that according to its consultant, "Mr. Abrams did not meet the criteria for

---

[3] The neuropsychologist did observe mild learning deficiencies and memory deficits, as well as moderate impairments on "complex visual-spatial retrieval of a Rey Complex figure" in both short- and long-term retrieval. AR 2316. Nevertheless, the neuropsychologist did not see "any compelling evidence for a mild cognitive impairment at this time." AR 2310.

ORDER - 6

1  CFS" because "his medical records have not supported significant cognitive impairment,"
2  as is "required for the diagnosis of CFS." AR 3973.

3      Plaintiff has not worked since April 2020. AR 1639, 3803–04. He has not been
4  paid since July 2020. *Id.* Since that time, Plaintiff has exhausted his savings account, sold
5  his house, and drawn on retirement savings to afford daily life. AR 3956, 3964–65.
6  Plaintiff now moves to recover benefits under the Policy. Unum argues that it was correct
7  to deny coverage.

8  **Discussion**

9      The Employee Retirement Income Security Act of 1974 ("ERISA") provides that
10 a "participant" may bring a civil action "to recover benefits due to him under the terms of
11 his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future
12 benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *Metro. Life Ins. Co. v.*
13 *Glenn*, 554 U.S. 105, 108 (2008). Plaintiff brings this action to recover benefits under the
14 Policy, and Defendant now moves to sustain its denial of benefits. The presumptive
15 standard of review for ERISA benefit determinations is *de novo*. *Firestone Tire & Rubber*
16 *Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the parties agree that the *de novo* standard
17 of review applies. *See* Pl. Mot. at 17 (docket no. 26 at 22); Def. Mot. at 13–14 (docket no.
18 25 at 17–18). When a district court reviews a denial of benefits *de novo*, the claimant
19 bears the burden of proving that he or she is entitled to benefits under his or her plan. *See*
20 *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010). Further, as the
21 parties agree, "[w]here review is *de novo*, a Rule 52 motion appears to be the appropriate
22 mechanism for resolving the dispute." *Gallupe v. Sedgwick Claims Mgmt. Servs. Inc.*,
23

ORDER - 7

358 F. Supp. 3d 1183, 1190 (W.D. Wash. 2019). Accordingly, the Court will resolve this dispute under Rule 52.

The claimant must demonstrate disability under the terms of the plan by a preponderance of the evidence. *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1162–63 (9th Cir. 2016) (citing *Muniz*, 623 F.3d at 1294). This standard does not relieve the plan administrator from its duty to engage in a "meaningful dialogue" with the claimant about his claim. *See Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) ("[W]hat [29 C.F.R. § 2560.503–1(g) ] calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries . . . . [I]f the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it.").

### A. LTD Benefits

Under the terms of the Policy, to prove disability and an entitlement to LTD benefits, Plaintiff must show that he was unable to perform the material and substantial duties of his regular occupation and that he was continuously disabled throughout the 90-day elimination period. AR 1213. Under the Policy, a trial lawyer's "regular occupation" is determined by examining how it is performed in the national economy. AR 125. Trial practice requires a high-level of cognitive work. That work also takes a physical toll. Trial lawyers must analyze complex issues, AR 201, make court appearances, *id.*, often work 15-hour days, AR 2533, and travel extensively, *id.*; *cf. Salomaa v. Honda Long-Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011) (describing the duties of a white-collar professional). The Court is intimately familiar

ORDER - 8

with trial work and its complexity. Being a trial lawyer is akin to writing, directing, producing, and starring in a play simultaneously. The work is mentally and physically grueling. A reviewer must take that complexity into account when reviewing a claim. *See Brown v. UNUM Life Ins. Co. of Am.*, 356 F. Supp. 3d 949, 966 (C.D. Cal. 2019) ("Unum's physician consultants . . . did not discuss Plaintiff's ability to satisfy the non-physical demands of her usual occupation; instead, they focused on the minimal physical demands, finding that Plaintiff could meet those demands.")

The Court *finds*, by a preponderance of the evidence, that Plaintiff was unable to perform the material and substantial duties of his occupation throughout the elimination period, and he is not capable of performing his duties today. In April 2020, Plaintiff's family, his doctors, and his colleagues all saw a significant shift in his demeanor and abilities. AR 1871–75, 3806, & 3952–63.  Plaintiff went from training for a marathon and working 12-hour days to being housebound. Plaintiff suffered almost daily fevers, brain fog, decreased attention and concentration, and malaise. Plaintiff has not performed trial work since April 2020.

Plaintiff's doctors agree that he is sick. Three medical doctors diagnosed Plaintiff with "long COVID," *see* AR 1555, 3760, & 3788–3801, and four medical doctors diagnosed him with CFS, *see* AR 592, 1398, 1520, 1551, 3484, 3786, & 3790. Neuropsychological testing revealed that Plaintiff was not malingering. AR 2313–16. Plaintiff's primary physician also consistently noted his disability, stating that he would be "unable [to work] for more than 0-2 hours per day" and would "not be able to put together 1-2 workdays or partial workdays in a given week." AR 1633. According to this

ORDER - 9

physician, it would be "inconceivable that he could work in any job part-time or full-time." *Id.*

Plaintiff is disabled by a "sickness" defined in the Policy as an "illness or disease." AR 126. As Plaintiff's primary care physician explained in her September 2020 letter, "Although we have not had a unifying diagnosis for his current symptoms, it is the symptoms that are causing his disability and inability to work in any capacity." AR 1248. Because of these symptoms, Plaintiff has not worked since April 2020. AR 1639, 3803–04. He has not been paid since July 2020. *Id.* Since that time, Plaintiff has exhausted his savings account, sold his house, and drawn on retirement savings to afford daily life. AR 3964–65. If Plaintiff were able to work, then he would have done so prior to selling his home and exhausting his savings. Instead, Plaintiff remains housebound and unemployed. Accordingly, Plaintiff has met his burden of establishing disability.

In opposition, Defendant primarily argues[4] that the diagnoses proposed by Plaintiff's physicians are incorrect. Defendants may be right on that score. As to "Long COVID," Plaintiff has submitted a paucity of persuasive evidence that he indeed suffered, or suffers, from COVID. As to Plaintiff's CFS diagnosis, Defendant has submitted facts that support the conclusion that Plaintiff does not have a cognitive impairment, which is a necessary predicate for a CFS diagnosis. *See* AR 2310–2316, 1293–1297, 1326, & 3903.

---

[4] Defendant also argues that Plaintiff is faking, but the neuropsychological testing that Plaintiff underwent cuts heavily against that assertion. *See* AR 2313–16. Plaintiff also presents objective evidence of his daily fevers. Docket no. 20.

ORDER - 10

The accuracy of Plaintiff's diagnoses is not, however, the question before the Court.  As observed in another matter involving Unum,

> "Unum may be correct that [the plaintiff] has not been correctly diagnosed. But that does not mean he is not sick. If [the plaintiff's] complaints, and [the doctor's] assessments, are to be believed, [the plaintiff] cannot focus for more than a few minutes at a time, making it impossible for [the plaintiff] to perform the varied and complex tasks his job requires.

*Bunger v. Unum Life Ins. Co. of Am.*, 196 F. Supp. 3d 1175, 1187 (W.D. Wash. 2016). If Plaintiff cannot follow movie plots, AR 1638, and suffers daily fevers, docket no. 20, then Plaintiff cannot be expected to plan out trial strategies for multiple, complex cases.[5]

For the foregoing reasons, Plaintiff's Rule 52 motion, docket no. 26, is GRANTED as to past LTD benefits through the date of judgment. Plaintiff also is entitled to LTD payments from the date of judgment through July 20, 2023, absent a showing of improvement such that a reasonable physician would conclude that plaintiff can return to work in his regular occupation, without undue disruptions or absences due to his illness and its related symptoms. Defendant's Rule 52 motion is DENIED in part as indicated in this paragraph.

B. **Bad Faith**

Plaintiff asserts that Defendant denied his claim in bad faith. The Court disagrees. Although Plaintiff has met his burden in this case, the evidence of disability is not

---

[5] Defendant argues that one of Plaintiff's doctors encouraged him to return to work. Defendant overstates the evidence. One of Plaintiff's physicians encouraged him to resume "light physical activity." AR 3903. "Light physical activity" does not automatically mean that Plaintiff can engage in the grueling practice of trial work.

ORDER - 11

overwhelming. For example, Plaintiff does not have a compelling, unifying diagnosis for his symptoms. Plaintiff does not suffer from a significant cognitive impairment. AR 2313 & 3903. And Plaintiff was able to sit through a long battery of neuropsychological testing while calling it "boringly easy." AR 1527 & 2516. Because multiple relevant pieces of evidence in this case support Defendant's denial, the Court concludes that Defendant did not act in bad faith. *See San Jose Healthcare Sys., LP v. Stationary Eng'rs Loc. 39 Pension Tr. Fund*, No. 21-CV-09974, 2022 WL 16637995, at *3 (N.D. Cal. Nov. 2, 2022) (holding that insurer did not act in bad faith when it based its decision on a "non-frivolous, although ultimately incorrect, interpretation" of an insurance agreement). Plaintiff's Rule 52 motion as to bad faith is DENIED, Defendant's Rule 52 motion is GRANTED in part, and Plaintiff's bad faith claim is DISMISSED with prejudice.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)     Plaintiff's Rule 52 motion, docket no. 26, is GRANTED in part as to LTD benefits and DENIED in part as to bad faith. Plaintiff has been disabled under the Policy for purposes of LTD benefits and Plaintiff is entitled to benefits. Plaintiff is entitled to past benefits through the date of judgment, along with pre-judgment interest at a rate to be determined, and post-judgment interest at the rate set forth in 28 U.S.C. § 1961. Plaintiff also is entitled to LTD payments from the date of judgment through July 20, 2023, absent a showing of improvement such that a reasonable physician would conclude that plaintiff can return to work in his regular occupation, without undue disruptions or absences due to his illness and its related symptoms.

(2) Defendant's Rule 52 motion, docket no. 25, is GRANTED in part as to bad faith, and otherwise is DENIED. Plaintiff's bad faith claim is DISMISSED with prejudice.

(3) Any motion for attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1) shall be filed no later than 14 days from the date of this Order and shall be noted in accordance with the Local Civil Rule 7(d). Plaintiff is DIRECTED to submit a proposed form of judgment within 14 days from the date of this Order. Defendant shall file any objections to the proposed form of judgment within seven days of its submission.

(4) Plaintiff's unopposed motion to seal, docket no. 28, is DENIED as moot.

(5) The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 27th day of December, 2022.

Thomas S. Zilly
United States District Judge

ORDER - 13